# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6247 | **DATE** | 11/25/2003 |
| **CASE TITLE** | Brotherhood of Maintenance of Way Employees vs. Burlington Northern Sante Fe | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, defendant's motion for a preliminary injunction is granted [3-1]. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | NOV 26 2003 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | 27 |
| | Copy to judge/magistrate judge. | | |
| MF | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, an unincorporated association,<br><br>Plaintiff,<br><br>v.<br><br>THE BURLINGTON NORTHERN AND SANTE FE RAILWAY COMPANY, a corporation,<br><br>Defendant. | **DOCKETED**<br>NOV 2 6 2003<br><br>No. 03 C 6247<br><br>Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff, the Brotherhood of Maintenance of Way Employees ("BMWE"), filed suit against Defendant, Burlington Northern and Sante Fe Railway ("BNSF"), seeking a declaration that BNSF violated the Railway Labor Act ("RLA") by subcontracting out certain rail welding and grinding work. Subsequently, BNSF moved for a temporary restraining order to prevent BMWE from striking or picketing at BNSF's facilities in response to BNSF's subcontracting out the rail welding and grinding work. The TRO motion was converted to a motion for preliminary injunction, and the parties submitted briefs in support of their positions. A hearing on the motion for preliminary injunction was held, and the parties have submitted post-hearing briefs.

### BACKGROUND

BMWE is a labor association that is the duly designated representative for collective bargaining of BNSF employees working in the class or craft of maintenance of way employees. BNSF is a rail carrier that conducts rail operations in various states in the Midwestern and western portions of the United States.



BMWE and BNSF are parties to a collective bargaining agreement ("CBA"). Among other things, BNSF maintenance of way employees represented by BMWE are responsible for constructing, maintaining, repairing, rehabilitating, upgrading and renewing BNSF's track and right of way. Rail welding work and related rail grinding work is involved with track construction, repair, rehabilitation, upgrading, and renewal. Rule 55 of the CBA lists various classifications of maintenance of way work that is covered by the CBA. "Welder" and "grinder" are included in the classifications contained in Rule 55. Rule 55 contains a specific provision for contracting out work that is "customarily performed by employees in the Maintenance of Way and Structures Department." Rail welding and grinding work is work that is "customarily performed by employees in the Maintenance of Way and Structures Department."

The "Note to Rule 55 " of the CBA states, in pertinent part:

> By agreement between the Company and the General Chairman, work as described in the preceding paragraph which is customarily performed by employee[s] described herein, may be let to contractors and be performed by contractors' forces. However, such work may only be contracted provided that special skills not possessed by the Company's employee, special equipment not owned by the Company, or special material available only when applied or installed through supplier, are required; or when work is such that the Company is not adequately equipped to handle the work, or when emergency time requirements exist which present undertakings not contemplated by the Agreement and beyond the capacity of the Company's forces. In the event the Company plans to contract out work because of one of the criteria described herein, it shall notify the General Chairman of the Organization in writing as far in advance of the date of the contracting transaction as is practicable and in any event not less than fifteen (15) days prior thereto, except in 'emergency time requirements' cases. If the General Chairman, or his representative, requests a meeting to discuss matters relating to the said contracting transaction, the designated representative of the Company shall promptly meet with him for that purpose. Said Company and Organization representative shall make a good faith

2

attempt to reach an understanding concerning said contracting, but if no understanding is reached the Company may nevertheless proceed with said contracting, and the Organization may file and progress claims in connection therewith.

By letter dated July 14, 2003, BNSF informed BMWE General Chairman, David Joynt, that BNSF was planning to subcontract out certain welding and grinding work. The letter stated, in pertinent part:

> As you are aware, for quite some time the Carrier has been unable to maintain an adequate qualified welding force in the Chicago area. The unwillingness of enough qualified employees to accept and retain assignments to that area has resulted in a mounting backlog of welding work, which must be completed in order to avoid endangerment to the safe and efficient operation of freight and commuter rail traffic there.
>
> Loss of production time, the approaching winter season, and the imminent risk of loss of METRA funding all require contracting this work now, inasmuch as it is beyond the capacity of the Carrier's own forces.
>
> Please consider this notice that the Carrier proposes to contract for six welding workers (3 Welders and 3 Grinder Operators) for thermite welding work in and around the Chicago area (principally in the Barstow, Chicago, Mendota, and Ottumwa Subdivisions). The work would begin approximately August 1, 2003, and continue for the remainder of this year, as long as weather permits.

By letter of July 16, 2003, Joynt requested a subcontracting out conference per Note to Rule 55. Joynt also stated that he did not concur with the work being contracted to outside parties because BMWE forces possessed all the skills necessary to perform the work and BNSF possessed all of the necessary machinery and equipment to accomplish the work. Furthermore, the type of work had customarily been performed by BMWE forces, and such employees were available to perform the work. On July 31, 2003, the parties conferred by conference call. Joynt reiterated and expanded his objections to the contracting out of the welding and grinding work.

3

BNSF contracted out the welding and grinding work. On September 9, 2003, BMWE gave notice to BNSF that ten days after the date of the letter, or anytime thereafter, the System Division may engage in a strike, work stoppage, picketing or other self-help against BNSF in connection with the dispute over the contracting out of the thermite welding work. On September 15, 2003, BNSF moved for a temporary restraining order against any strike and/or picketing by BMWE.

At the TRO hearing, Chris Roberts, the Assistant Vice-President of Operations South Region for BNSF, testified that there are over 30,000 miles of track for the BNSF railroad with approximately 1,500 trains on the system on an average day. In addition, the BNSF railway system is used by METRA to transport 52,000 to 58,000 people on a weekday. If BMWE did strike and picket, Roberts opined that other workers would refuse to cross the picket line, and the entire BNSF railway network would be negatively impacted.

Steven Goodall, the Chief Engineer South Region of BNSF, testified that the removal of rail joints was a safety issue and was the cause of at least one derailment in California. The subcontractors at issue were hired to eliminate the joints. Timing of correcting the weld joints was important because the welding should not place if the temperature is below 0 degrees Fahrenheit. If the welding is completed when the temperature is between 0 and 50 degrees Fahrenheit, the time needed to complete the welding is doubled. As such, and in lieu of budget constraints, it would have been inefficient for BNSF to hire welders that had been furloughed in January, February, and March 2003.

During 2003, there were 110 specific occasions that BNSF bulletined a job as a job vacancy, and the job either did not receive a bid or went unfilled. On October 3, 2003, there

were no employees with welding subdepartment seniority on the Galesburg seniority district on furlough. BNSF had advertised for welding positions up to the date of the hearing.

Joynt testified that he believed that BNSF could have filled the positions in January, February, and March 2003 with individuals that furloughed at that time. Joynt also believed that the positions could be filled with individuals that had recently been available because the "gangs" of which they were a part had been abolished.

## ANALYSIS

Labor disputes involving railroads and unions are governed by the RLA. The RLA was designed to "avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." 45 U.S.C. § 151a.

The RLA sets out a complete framework for the resolution of labor disputes, which includes a mandatory arbitration mechanism for the swift and systematic settlement of two types of disputes, major disputes and minor disputes. *Monroe v. Mo. P. R.R. Co.*, 115 F.3d 514, 516 (7th Cir. 1997) (*Monroe*). Major disputes relate to the creation or changing of collective bargaining agreements or attempts to secure collective bargaining agreements. *See Pawlowski v. N.E. Regl. Commuter R.R. Corp.*, 186 F3d 997, 1000 (7th Cir. 1999). Major disputes seek to create contractual rights. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994) (*Hawaiian Airlines*); *Monroe*, 115F.3d at 516. Minor disputes involve discrepancies concerning the meaning of an existing collective bargaining agreement in a specific fact situation and are said to "grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions". *See* 45 U.S.C. § 151(a); *Hawaiian Airlines*, 512 U.S. at

5

252. Similar to disputes over the interpretation or application of the collective bargaining agreements, "grievances" are disagreements concerning the effect to be given to bargained-for agreements. *Hawaiian Airlines*, 512 U.S. at 253. A minor dispute is distinguishable from a major dispute in that it can be conclusively resolved through the interpretation of the existing collective bargaining agreement. *Brown v. Ill. C. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001) (*Brown*). "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 307 (1989) (*Consolidated*).

BNSF contends that the dispute over subcontracting out the welders and grinders is classified as a minor dispute because it requires interpretation of the existing CBA. BMWE contends that the dispute is classified as a major dispute because BNSF's attempt to contract out the work was without justification in the CBA and constitutes an effective repudiation of and unilateral change of the agreement in violation of the RLA.

BNSF gave notice to BMWE that it was subcontracting out the welding and grinding work because of the lack of an adequate qualified welding force in the Chicago area that had created a backlog of welding work and that such backlog created safety issues. BNSF argues that such subcontracting is allowed pursuant to the Note to Rule 55, specifically, the provision that allows subcontracting "when work is such that the Company is not adequately equipped to handle the work." BMWE argues that the above justification does not fall within any of the specified provisions found in the Note to Rule 55, including "when work is such that the

6

Company is not adequately equipped to handle the work."

The dispute between BNSF and BMWE falls within the definition of a minor dispute because it grows out of the interpretation and the application of the CBA and can be conclusively resolved through the interpretation of the existing collective bargaining agreement. *See Hawaiian Airlines*, 512 U.S. at 252; *Brown*, 254 F.3d at 658. BNSF's stated reason for subcontracting out the work the need to have the work completed and the lack of welders and grinders to do the work and that "emergency" time requirements exist in light of the safety issues, are fairly supported by the evidence and are arguably justified by the terms of the parties' CBA. *Consolidated*, 491 U.S. at 307. BNSF is not attempting to unilaterally change the CBA but is acting pursuant to its interpretation of the existing CBA. Thus, there is no indication the issue is anything other than a minor dispute.

A minor dispute is subject to compulsory and binding arbitration before the National Railroad Adjustment Board. *See Consolidated*, 491 U.S. at 303. However, the district courts have jurisdiction to enjoin strikes arising out of minor disputes. *See Consolidated*, 491 U.S. at 304. Accordingly, the district courts can issue injunctions to enforce the RLA provisions notwithstanding the Norris-LaGuardia Act's ("NLGA") general rule that courts do not have jurisdiction to enter injunctions against labor unions in cases growing out of labor disputes. *See United Airlines, Inc. v. International Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 362 (7th Cir. 2001) (*United Airlines*). However, the procedural provisions of the NLGA remain in effect. *See United Airlines*, 243 F.3d at 363 n. 9, 364.

Unlike a major dispute, a railroad may continue to apply its interpretation of the CBA and implement its view on that issue pending the decision by the Adjustment Board. The union

7

is prohibited from striking pending and following the decision of the Adjustment Board. *See Burlington Northern R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1272 (7th Cir. 1988) (*United Transp.*), citing *Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30 (1957) (*Trainmen*).

While the Supreme Court has held that the specific provisions of the RLA take precedence over the more general provisions of the NLGA, *Trainmen*, 353 U.S. at 42, it is unclear whether an injunction must meet the requirements set forth in Section 107 of the NLGA or those set forth in Federal Rule of Civil Procedure 65. *See United Airlines*, 243 F.3d at 363 n.9; *Retail Clerks Union Local 1222 v. Lewis, Inc.*, 327 F.2d 442, 446-48 (9th Cir. 1964). However, BNSF has met the elements under either requirement.

Section 107 of the NLGA requires that, after a hearing in open court, the court must make findings of fact that (1) unlawful acts have been threatened and will be committed unless restrained, (2) substantial and irreparable injury to complainant's property will follow, (3) greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon the opposing party by the granting of relief, (4) the complainant has no adequate remedy at law, and (5) the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection. 29 U.S.C. § 107. Federal Rule of Civil Procedure 65 requires the consideration of the following factors: (1) the threat of irreparable harm to movant, (2) the state of the balance between the harm and any injury caused by granting the order, (3) the probability of success on the merits, and (4) the public interest. However, the district courts can enjoin a violation of the *status quo* pending completion of the required procedures without the customary showing of irreparable injury. *See Consolidated*, 491 U.S. at

302.

Here, BMWE has threatened to strike and will not remove such threat unless BNSF does not use the subcontractors for the welding and grinding work. BNSF has also demonstrated that substantial and irreparable injury to its property would follow if BMWE did strike. "Property" includes not only tangible property but also the right to use that property. *See Knapp-Monarch Co. v. Anderson*, 7 F. Supp. 332, 337 (N.D. Ill. 1934). This property injury includes the disruption in the use of the property that would cause major disruptions in both the transportation of goods, such as coal and farm product, and the disruption of at least part of the public transportation system used by several thousand individuals. In addition, if the work is not timely completed, safety issues arise because of the welding joints. While BNSF need not demonstrate irreparable injury, *Consolidated*, 491 U.S. at 302, the disruption in transportation would cause such harm. The harm to BNSF would be greater than that of the harm to BMWE if the injunction is not granted. BNSF has demonstrated that the welding and grinding positions have been advertised and remained unfilled. The timely completion of the welding and grinding work is imperative to both the safety of the railroad and the efficient use of funds. Similarly, BNSF does not have an adequate remedy at law, typically monetary damages, that remedy the consequences of a strike or similar work stoppage. Lastly, the last element under Section 107 is not applicable. Based on the foregoing, BNSF has demonstrated that the issuance of an injunction is warranted pursuant to Section 107 of the NLGA.

The above findings of fact also demonstrate that an injunction is warranted pursuant to Fed. R. Civ. P. 65. The state of balance between the harm to BNSF by not granting the injunction is greater than the harm to BMWE in granting the injunction. BNSF has also

9

demonstrated that it has a likelihood of success through the introduction of several opinions of the Adjustment Board under similar facts of the instant case in which the arbitrator ruled in the railroad's favor. Lastly, the public interest, in the continued and safe transportation of goods and services, is great. Accordingly, the issuance of an injunction is also warranted pursuant to Fed. R. Civ. P. 65.

BMWE also argues that an injunction should not issue because BNSF has violated the RLA by unilaterally changing the CBA and/or has unclean hands pursuant to Section 108 of the NLGA. As discussed above, BNSF has not unilaterally changed the CBA, which would constitute a major dispute. Instead, BNSF has proceeded based on its interpretation of the CBA, which does not constitute a violation of the RLA. *See United Transp.*, 862 F.2d at 1272.

Section 108 of the NLGA provides that no injunctive relief is available to a party that has failed to comply with any obligation imposed by law which is involved in the labor dispute in question or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of mediation or arbitration. 29 U.S.C. § 108. As discussed above, BMWE has failed to demonstrate that BNSF has failed to comply with any obligation imposed by law by proceeding with its interpretation of the CBA. In addition, BNSF has made reasonable efforts to settle the dispute and has always insisted on arbitration. Accordingly, Section 108 does not prevent the issuance of injunctive relief. *See United Airlines*, 243 F.3d at 365 (Section 108 "does not require a party who is already engaging in good-faith effort to settle the labor dispute ... to 'exert every reasonable effort' to prevent or end an unlawful strike or work action before seeking judicial relief").

Lastly, BMWE requests that if an anti-strike injunction is issued, it should be conditioned

10

on the requirement that the dispute be submitted for expedited arbitration before the Special Board of Adjustment. BMWE makes this request because of the of the lengthy time it generally takes to have disputes decided by the Adjustment Board. BNSF argues against submitting the case for expedited arbitration. BMWE makes the additional argument that this refusal constitutes a violation of Section 108 of NLGA. However, as stated above, a party making a good-faith effort need not agree to exert every reasonable effort to prevent the unlawful strike; and neither the RLA or NLGA mandate that expedited arbitration take place if an injunction is issued. Accordingly, BMWE's request to condition the issuance of the injunction on the submission of the dispute for expedited arbitration before the Special Board of Adjustment is denied.

## CONCLUSION

For the foregoing reasons, BNSF's Motion for a Preliminary Injunction is granted.

Dated: *November 25, 2003*

*[signature]*

JOHN W. DARRAH
United States District Judge

11